UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DURELL T. CRAIN,

    Plaintiff,

    v.       CAUSE NO. 3:24-CV-984-HAB-APR

WILKS, et al.,

    Defendants.

OPINION AND ORDER

Durell T. Crain, a prisoner without a lawyer, filed an amended complaint. ECF 10. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

Crain suffers from asthma and high cholesterol. He alleges that, in November or December 2021, while housed at the Pendleton Correctional Facility ("PCF"), he developed lung pain, headaches, a scratchy throat, coughing, and shortness of breath. His inhaler was not effective in resolving his shortness of breath. Dissatisfied with the medical attention he received at PCF, Crain talked with a family member and learned that there was an outbreak of Legionnaires' disease at PCF. Legionnaires' disease is

caused by a bacterium known as legionella and results in a severe form of pneumonia. https://www.cdc.gov/legionella/about/index.html (last visited Apr. 3, 2025). It is contracted by inhaling legionella from contaminated water or soil. https://www.mayoclinic.org/diseases-conditions/legionnaires-disease/symptoms-causes/syc-20351747 (last visited Apr. 3, 2025). Legionnaires' disease can result in death, but it is usually cured with antibiotics. *Id.*

Crain wrote a message to I.D.O.C. Medical Director Dr. Kristen Dauss, sent it to a family member, and had a family member forward the message to Dr. Dauss in the beginning of December. Dr. Dauss indicated she would look into Crain's complaints. On December 6, 2021, Crain was seen by medical staff at PCF. He was prescribed Tylenol and Zithromax.[1] He also provided a urine sample to be tested for legionella. Crain's allegations here are confusing. He states: "Dr. Kristen Dauss authorized Centurion Regional Director's Dr. Wilke & Dr. Stephanie Riley to authorize medical @ P.C.F. to either not submit my urine test to the lab or destroy the results, conspiring with the Indiana Department of Corrections / prior commissioner to cover up my legionnaires' infection." ECF 10 at 4.

At the end of December 2021 and beginning of January 2022, Crain sent more messages to Dr. Dauss. He explained that he seemed to get better with the antibiotics, but not completely. After stopping them, his condition worsened. He also asked for his test results, which he believes were being hidden, because he wanted the facility to add

---

[1] Zithromax (azithromycin) is an antibiotic commonly used to treat Legionnaires' disease. https://my.clevelandclinic.org/health/diseases/17750-legionnaires-disease (last visited Apr. 3, 2025).

filters for the water in his dorm. She did not respond, and filters were not utilized in Crain's cell house. However, Crain was seen by medical at PCF again on January 11, 2022. The provider ordered more Zithromax and Tylenol. The provider also ordered x-rays. Crain notes that he did not start the Zithromax until January 15, 2022; he does not explain the reason for the delay. Here, his allegations are again confusing. He says he "attempted to stretch the antibiotics out as long as [he] could because [he] knew [he] was getting transferred, and Dr. Kristen Dauss authorized Dr. Wilks & Dr. Stephanie Riley to authorize P.C.F. medical staff to not give me a[n] x-ray, conspiring with the Indiana Department of Corrections/prior commissioner to cover up my legionnaires' infection." *Id.* at 4.

Crain was transferred to New Castle Correctional Facility ("NCF"). He submitted a health care request on February 6, 2022, because he did not receive the x-ray that was ordered when he was at PCF. He indicated in his health care request that he had pain in his lungs and shortness of breath, and at times he had wheezing. He received an x-ray the next day. In the middle of February, he saw a doctor (he does not indicate who) and told the doctor he had Legionnaires' disease. He provided the doctor with the dates he had been prescribed Zithromax and the date he provided a urine sample to be tested for legionella. This doctor indicated he did not see anything in his records about his doctor's visits on December 6, 2021, or January 11, 2022. He also did not see anything in Crain's records about the urine testing or Zithromax being ordered for him. The doctor indicated that the x-ray did not show anything concerning. He also ordered another urine test for legionella given Crain's ongoing symptoms. This doctor renewed Crain's

3

Tylenol and asthma medications (Singulair, Albuterol inhaler, and Air Duo). He also ordered bloodwork and an EKG due to his symptoms. The EKG results and urine test were normal. He was prescribed prednisone.

Crain indicates he continued to submit health care requests for his symptoms but nothing more was done. He wrote Dr. Dauss again about his symptoms and received no response. He continued to receive Tylenol. In August 2022, an EKG was repeated due to Crain's ongoing complaints. It too was negative. He remained at NCF until October 2022. He alleges that he received Tylenol, EKGs, and an x-ray "with no diagnosis due to Dr. Kristen Dauss authorizing Dr. Wilks & Dr. Stephanie Riley to authorize medical @ New Castle Correctional Facility to take no further procedures to find a accurate diagnoses, all 3 knowing of the prior procedure's, and turning a blind eye to my symptom's for fear of them seeing the damage caused from my legionnaires' infection, & conspiring with the Indiana Department of Corrections/prior Commissioner to cover up my infection." *Id.* at 5-6. In short, he speculates that, in 2021, Dr. Dauss, Dr. Wilke, and Dr. Riley conspired to conceal evidence he had become infected with Legionnaires' disease.

In March 2022, Crain filed a lawsuit in the United States District Court for the Southern District of Indiana against defendants not named in this lawsuit[2] regarding Legionnaires' disease. *See Crain v. Reagle*, No. 1:22-CV-621-JPH-KMB (filed Mar. 28, 2022). Crain asserts that all defendants named in this case are aware of his other lawsuit

---

[2] In *Crain v. Reagle*, No. 1:22-CV-621-JPH-KMB, Crain is suing Dennis Reagle, not Commissioner Christian Reagle.

4

about Legionnaires' disease, and they are conspiring to not find a diagnosis for his symptoms because of the lawsuit.

On October 2022, Crain was transferred to Indiana State Prison ("ISP"). He submitted health care requests there too, based on his same, ongoing symptoms. He was seen by a nurse practitioner at the end of October, and he told the nurse about his suspected Legionnaires' disease. She refilled Crain's Tylenol and asthma medications (including Singular). She ordered x-rays and blood tests, and she prescribed prednisone. He explained to her that these things had already been tried, but she did not offer any other treatment options. Crain wrote Dr. Dauss again. She did not respond.

At some point when he was at ISP (Crain does not say when) he complained of pain in his heart and was sent to the medical department. Another EKG was performed. It too was normal.

In the beginning of November 2022, Crain saw Dr. Marthakis. He shared his symptoms and treatment history with her. She renewed his asthma medications. Crain was unhappy that Dr. Marthakis did not offer him more treatment and wrote to HSA Sherri Fritter; she did not respond.[3] After this, HSA Fritter was in his block responding to another inmate's inquiry and she looked directly at Plaintiff and said, "we can only do what central office allows us to do." *Id.* at 7.

---

[3] HSA Sherri Fritter is not a defendant in this action.

5

Crain filed grievances, which pursuant to policy, are to be sent to the HSA and health quality assurance employee, and they work with either the Chief Medical Officer or her designee to investigate. Crain believes that, if nothing was found with the blood tests, EKGs, and x-rays, additional testing should have been done. Crain indicates that he has not had an EKG since December 2022, although he continued receiving x-rays, blood tests, and Tylenol.

During 2023, Crain continued to complain, including to Dr. Marthakis, but his treatment was not altered. In March 2023, Crain told Dr. Marthakis that Tylenol was becoming ineffective, and he was needing to take more than the recommended dose to control his pain. She kept prescribing Tylenol. However, when in the beginning of 2024, Crain learned from family that this could be dangerous, he stopped taking it. As a result, he suffers from more lung and heart pain now. Although diagnosed with asthma and high cholesterol, Crain indicates he still does not have a diagnosis that he feels explains his chest pain.

On July 7, 2024, Crain submitted a grievance. He was seen by Nurse Practitioner D. Thews in mid-July. Crain explained his symptoms. Nurse Practitioner Thews ordered an x-ray. She asked Crain if he wanted Tylenol. He said yes, although he explains in his amended complaint that he only said yes so that Nurse Practitioner Thews would not claim that he refused medical care. Nurse Practitioner Thews did not offer an opinion on the cause of his symptoms.

Crain saw Dr. Marthakis again at the end of July 2024, for a chronic care visit. He again catalogued his symptoms for her. She did nothing but order Singulair even

6

though he told her he stopped taking it because it was ineffective. Again she did not indicate what she believed had caused his symptoms. After this visit, Crain started having headaches that Tylenol did not help.

Dr. Wilks and Dr. Riley responded to his July 7, 2024, grievance by noting that he had his chronic care visit with Dr. Marthakis in July. He again alleges that Drs. Wilks and Riley were acting in collusion with Dr. Dauss, turning a blind eye to his symptoms for fear of seeing the harm Legionnaires' disease has caused him. They allegedly conspired with Dr. Marthakis, Nurse Practitioner Thews, and Commissioner Reagle to cover up evidence that he had suffered from Legionnaires' disease.

Crain was transferred to the Westville Correctional Facility ("WCF"). On November 14, 2024, Crain saw Dr. Liaw at WCF. Crain explained his pain, describing "pain in [his] lung's, pain in [his] heart, & shortness of breath @ times sometimes lasting for around 30 minutes & my inhaler's being ineffective." ECF 10 at 10. Dr. Liaw removed Crain from the Singular that Dr. Marthakis put him on because Crain reported it was ineffective. Dr. Liaw thought the pain might be from exercise, but Crain dismissed this possibility because he had not exercised since he arrived at WCF. Dr. Liaw told him to "calm down" and sent him back to his cell.

On November 25, 2024, Crain had shortness of breath, and his inhaler was ineffective in controlling his symptoms. He told the nurse, and she provided Tylenol. When the pain lasted longer than normal, he told a correctional officer, who said he told a nurse, but a nurse did not come to check on him.

7

On November 26, 2024, Crain's fiancé both called the facility and emailed Dr. Dauss again. After that, a nurse saw him for a blood draw. When Crain mentioned the request for heath care, she located the request, and they discussed it. She sent him back to his cell without offering her opinion about the cause of his symptoms.

He filed an emergency grievance about the medical care he received on November 14, 2024, and November 26, 2024. The next day, he was given prednisone even though he had been prescribed prednisone before and it had been ineffective.

On December 10, 2024, Crain was told a chest x-ray had been ordered. Crain notes that his symptoms continue and he is "not receiving anything for the pain nor received a[n] accurate diagnoses, causing me mental stress & psychological stress not knowing what's going on, due to Dr. Kristen Dauss authorizing Dr. Wilks & Dr. Stephanie Riley to authorize medical @ Westville Correctional Facility to take no further procedures, besides that have been done several times, to find a accurate diagnoses, all 3 knowing of the prior procedures, and turning a blind eye to my symptoms for fear of them seeing the damage caused from my legionnaires' infection, & conspiring with the Indiana Department of Corrections/Commissioner Christina Reagle (Prior Warden of P.C.F., Dennis Reagle, a defendant in my current legionella case, wife) to cover up my legionnaires' infection." *Id.* at 11.

He claims that, after emailing Dr. Dauss and filing a grievance, he has been denied medical attention. The x-ray was performed on December 17, 2024. The following week, he gave a nurse a health care request slip. At the time he submitted his amended complaint for filing, he had not yet received a response. On January 2, 2025,

8

he asked Nurse Ellis[4] for Tylenol. She said she would bring some, but she did not. Two days later, Nurse Shelling[5] agreed to bring Crain some Tylenol, but she also did not follow through and bring Crain the Tylenol. He believes that this too stems from the alleged conspiracy to cover up that he had Legionnaire's disease. Crain claims that he is being denied effective pain medication for his headaches, lung and heart pain. He also claims he is being denied a proper diagnosis.

Crain's allegations against I.D.O.C. Chief Medical Director Dr. Kristen Dauss, I.D.O.C. Commissioner Christina Reagle, and Centurion Regional Directors Dr. Wilks and Dr. Stephanie Riley all stem from his belief that there is a conspiracy to deprive him of a proper diagnosis and treatment following his exposure to Legionnaire's disease. These allegations amount to nothing more than mere speculation. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) ("mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [i]s not enough."). Crain emphasizes that he did not receive the results of the tests administered to determine if he had Legionnaires' disease. However, he was given medication commonly used to treat Legionnaires' disease and he admits he improved, although he believes his ongoing symptoms are somehow linked to the suspected Legionnaires' disease. The Constitution guarantees Crain adequate medical care, not a specific diagnosis.

Furthermore, "conspiracy is not an independent basis of liability in § 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (citing *Cefalu v. Vill. Of Elk*

---

[4] Nurse Ellis is not a defendant in this action.
[5] Nurse Shelling is not a defendant in this action.

9

*Grove*, 211 F.3d. 416, 423 (7th Cir. 2000). "Section 1983 does not . . . punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). "A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). There is no general respondeat superior liability under 42 U.S.C. § 1983. *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). "[P]ublic employees are responsible for their own misdeeds but not for anyone else's." *Id*. at 596. A supervisor can also be held liable if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). Thus, the court will consider whether Crain has alleged facts that permit a plausible inference that any defendant named in this action violated his constitutional right to adequate medical care.

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22

F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98 (internal quotations and citations omitted).

The law has "identified several circumstances that can be enough to show deliberate indifference" by a medical professional. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). "First, and most obvious, is [an] official's decision to ignore a request for medical assistance." *Id.* Second, an inmate can provide evidence the medical professional "persist[ed] in a course of treatment known to be ineffective." *Id.* at 730. Third, an inmate can provide evidence of "an inexplicable delay in treatment which serves no penological interest." *Id.*; *see also Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009).

While Crain speculates that Dr. Dauss conspired to prevent him from learning the results of a medical test that would have determined if Crain had been infected with Legionnaire's disease, Dr. Dauss was not responsible for Crain's day-to-day medical care. When Crain wrote to Dr. Dauss in December 2021, she said she would look into his complaints and shortly after that he was seen by medical staff and prescribed an antibiotic commonly used to treat Legionnaire's disease. When Crain wrote again and said that the antibiotic seemed to help because he got better, but then he got worse, Crain was subsequently seen by a medical provider and prescribed another course of antibiotics. On a couple occasions, Crain wrote Dr. Dauss and she did not respond. In November 2024, he wrote Dr. Dauss and was seen by medical staff for a blood draw shortly after he communicated with Dr. Dauss.

Here, Crain did not merely seek medical care at his facility — he went outside of the normal process of submitting a health care request form, above the facility doctors, and even the regional medical directors to the top doctor at the I.D.O.C. That he received any response is surprising. "'[N]o prisoner is entitled to insist that one employee do another's job,' and the division of labor is critical to the efficient functioning of the organization." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) (quoting *Burks*, 555 F.3d at 594). As the Seventh Circuit explained in *Burks*:

> The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. [The] view that everyone who knows about a prisoner's problem must pay damages implies that [a prisoner] could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000

12

>officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

*Burks*, 555 F.3d at 595. Likewise, Crain cannot hold Dr. Dauss liable for his allegedly inadequate medical care merely because he wrote to her and she knew of his complaints. As already explained, Dr. Dauss can be held liable for her misdeeds, but she cannot be held liable on a theory of respondeat superior liability. *Id.* at 594. The amended complaint does not allege that Dr. Dauss was personally responsible for providing Crain with medical care. Likewise, the factual allegations of the amended complaint do not support an inference that Dr. Dauss facilitated, approved, condoned, or turned a blind eye to any violation of Crane's constitutional rights. *See Matthews*, 675 F.3d at 708. Instead, she looked into his problem, resulting in treatment with medications commonly used to treat Legionnaire's disease, and he frequently received medical attention shortly after writing to her about his problems, even if she did not respond directly to him. It cannot be plausibly inferred from these facts that Dr. Dauss was deliberately indifferent to Crain's medical needs.

Crain has also named Dr. Wilks and Dr. Stephanie Riley, who are each regional medical directors, as defendants. Outside of his repeated conclusory assertions that they participated in a conspiracy to deprive him of adequate medical care, his only allegations against them are that they responded to his July 7, 2024, grievance by indicating that he had just seen Dr. Marthakis for a chronic care visit. Their response to

13

the grievance does not permit a plausible inference that they were deliberately indifferent to Crain's medical needs.

Crain has also named I.D.O.C. Commissioner Christina Reagle as a participant in the alleged conspiracy. He has, however, included no facts whatsoever that suggest Commissioner Reagle was personally involved in any decisions regarding Crain's medical care. Therefore, he may not proceed against her.

Crain is suing Dr. Nancy Marthakis and Nurse Practitioner Diane Thews due to alleged deficiencies in his medical care while he was housed as ISP. Crain alleges that he saw Dr. Marthakis in November 2022, and Dr. Marthakis renewed his asthma medications. He alleges he saw Dr. Marthakis in March 2023, and she renewed his Tylenol even though he told her it was not working adequately. And, he saw Dr. Marthakis in July 2024, and she renewed his Singular even though he told her he had stopped taking it because it was ineffective. Dr. Marthakis had access to Crain's medical records and could see that his complaints regarding pain had been ongoing and that he already received x-rays, EKG's, and blood tests to assess his condition. Not all medical problems can be fully solved, whether in or out of prison. "To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.

14

*Id.* (quotation marks and citation omitted). This is why courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quotation marks and citation omitted). "[M]ere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Prisoners are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), or to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). The allegations in Crain's amended complaint do not permit a plausible inference that Dr. Marthakis was deliberately indifferent to his ongoing medical needs when he was at Indiana State Prison.

Crain is suing Nurse Practitioner Thews even though he reports only one occasion where she provided him with medical care. Nurse Practitioner Thews saw Crain in response to his July 7, 2024, grievance. After he explained his symptoms, she ordered an x-ray. She asked if he wanted Tylenol, he said yes, and she prescribed it based on his response. Crain notes in his amended complaint that he said yes so that she would not claim that he refused medical care, even though it is ineffective, but Nurse Practitioner Thews cannot be faulted for prescribing Tylenol when Crain indicated he wanted Tylenol to be prescribed. Crain also faulted Nurse Practitioner

15

Thews for not offering an opinion on the cause of his symptoms. But the x-ray had not yet been performed, and Crain already had at least one diagnosis that could explain his symptoms: asthma. While Crain believes something further is wrong with him, tests have been done and those tests have been negative. Once again, not all medical problems can be solved. Nothing here suggests that Nurse Practitioner Thews failed to exercise her medical judgment in her single encounter with Crain when she ordered an x-ray and prescribed Tylenol after confirming he wanted her to do so.

Crain is also suing Dr. Liaw for alleged deficiencies in his care at WCF. Crain reports seeing Dr. Liaw only once, on November 14, 2024. Dr. Liaw removed Crain from the Singular that Dr. Marthakis put him on because Crain reported it was ineffective. Dr. Liaw thought the pain might be from exercise, but Crain indicated that he had not exercised since he arrived at WCU. Dr. Liaw told him to "calm down" and sent him back to his cell. In short, after meeting with Crain, Dr. Liaw removed a medication that Crain reported was not helpful and offered a possible explanation for Crain's symptoms that Crain rejected. These facts do not permit a plausible inference that Dr. Liaw, in his single interaction with Crain, was deliberately indifferent to his serious medical needs.

Crain has also filed multiple motions with the court. He filed a "Emergency Motion for Court to Take Notice of Plaintiff Not Receiving Medical Attention & Turning in his G.T.L. Tablet." ECF 9. He also filed a "Motion for Court to Take Notice of a Potential Transfer & Plaintiff Making a Response to Every Response / Opposition Defendant's Make to his Motions/Complaint &/or Filing a[n] Amended Complaint."

16

ECF 13. Next, he filed an "Emergency Motion for Court to Take Notice of Plaintiff Receiving his Tablet & Same Treatment Being Done with No Results." ECF 14. Motions are filed when a party is requesting some relief from the court. Here, it appears that Crain is merely asking that the court acknowledge his filing. This is unnecessary. There are no matters before the court requiring factual determination at this time, and when there is, he will have an opportunity to present his facts. Motions like this require judicial resources that would be better spent on substantive matters. This is especially so where motions asking merely that the court take notice are labeled as emergencies. These motions do not present emergencies. Labeling motions as emergency motions when there is not an emergency is inappropriate and an abuse of the judicial process. Therefore, each of these motions (ECF 9; ECF 13; ECF 14) will be denied. Crain is cautioned that he should refrain from filing such motions in the future, and failure to do so could result in sanctions.

Finally, both Crain's amended complaint (ECF 10) and a separate motion (ECF 15) seek a preliminary injunction requiring that he be given a proper diagnosis and treatment plan, and that that plan be followed. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the

17

absence of a complaint that states a claim, a plaintiff cannot demonstrate a reasonable likelihood of success on the merits. Because the amended complaint does not state a claim for which relief can be granted, no preliminary injunction can be granted.

Crain has already been permitted one opportunity to amend his complaint. In finding that his previous complaint did not state a claim, the court noted the following:

> A complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (quotation marks, citations and footnote omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quotation marks and brackets omitted). Thus, "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, might suggest that something has happened to her that might be redressed by the law." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (emphasis in original).

ECF 6 at 5. The amended complaint included additional details, but it nonetheless falls short.

"The usual standard in civil cases is to allow defective pleadings to be corrected, especially in early stages, at least where amendment would not be futile." *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018). A review of Crain's complaint and amended complaint suggest it is unlikely Crain will be able to state a claim. Nonetheless, in the interests of justice, he will be given another opportunity to amend his complaint *if he believes he can state a claim based on (and consistent with) the events described in this complaint*. To file an amended complaint, he needs to write this cause number on a **Pro Se 14 (INND Rev. 2/20) Prisoner Complaint** form which is available

18

from his law library. He needs to write the word "Amended" on the first page above the title "Prisoner Complaint" and send it to the court after he properly completes the form.

For these reasons, the court:

(1) DENIES Durell T. Crain's "Emergency Motion for Court to Take Notice of Plaintiff Not Receiving Medical Attention & Turning in his G.T.L. Tablet" (ECF 9);

(2) DENIES Durell T. Crain's "Motion for Court to Take Notice of a Potential Transfer & Plaintiff Making a Response to Every Response / Opposition Defendant's Make to his Motions/Complaint &/or Filing a[n] Amended Complaint" (ECF 13);

(3) DENIES Durell T. Crain's "Emergency Motion for Court to Take Notice of Plaintiff Receiving his Tablet & Same treatment Being Done with No Results" (ECF 14);

(4) DENIES Durell T. Crain's request for a preliminary injunction contained in his amended complaint (ECF 10) and his "Emergency/Urgent Motion for Court to Order I.D.O.C./Medical to Find Diagnosis & Treatment Plan for his Symptoms" (ECF 15);

(5) GRANTS Durell T. Crain until **May 8, 2025**, to file an amended complaint after considering the deficiencies explained in this order; and

(6) CAUTIONS Durell T. Crain that, if he does not respond by the deadline, this case will be dismissed under 28 U.S.C. § 1915A without further notice because the current complaint does not state a claim for which relief can be granted.

SO ORDERED on April 9, 2025.

                                                    s/ *Holly A. Brady*
                                              CHIEF JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT COURT